**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**MICHAEL CANDELARIA**
                              **Plaintiff,**

**vs.**                                                         **Civ. No. 08-901 JCH/WDS**

**ROBERT MONTOYA, AARON ALBERTI,
RONALD C. TORRES, HENRY PEREA, in
their individual capacities, and the BOARD
OF COUNTY COMMISSIONERS OF
BERNALILLO COUNTY,**

                              **Defendants.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendants Robert Montoya, Ronald C. Torres,

Henry Perea, and the Board of County Commissioners of Bernalillo County's *Motion for*

*Summary Judgment*, filed June 24, 2009 [Doc. 38] and Defendant Aaron Alberti's *Motion for*

*Summary Judgment*, filed June 29, 2009 [Doc. 39].  The Court having carefully considered the

motions, briefs, exhibits and relevant law, and being otherwise fully informed, finds that

Defendants Montoya, Torres, Perea, and Bernalillo County's motion [Doc. 38] should be

GRANTED in part and DENIED in part, and Defendant Alberti's motion [Doc. 39] should be

GRANTED in its entirety.

**<u>BACKGROUND</u>**

On or about June 5, 2006, an Albuquerque police officer arrested Plaintiff Michael

Candelaria on a traffic violation and outstanding warrants.  Following his arrest, the officer took

Plaintiff to the Bernalillo County Metropolitan Detention Center ("MDC"), where he was booked.

Plaintiff was no stranger to the MDC, having been incarcerated there more than ten times since

1995.  Pursuant to the MDC's policy, when Plaintiff was booked, he was interviewed to determine whether he had any gang affiliation or any known enemies in the facility.  Plaintiff advised that he had no known enemies or gang affiliations.  Plaintiff was initially placed in Unit 7 of the MDC, where he resided until August 22, 2006.

After receiving several threats in Unit 7 for "snitching" on a corrections officer who was allegedly bringing drugs into the prison, the MDC's classification committee relocated Plaintiff to Segregation Pod 8 (Seg 8) on August 22, 2006.  Seg 8 was the intake unit that received new arrestees awaiting classification and also received existing inmates who needed to be reclassified. The new arrestees were evaluated and placed with inmates incarcerated for similar seriousness of crimes, while those awaiting reclassification were evaluated to determine which unit would be safe for them.  Seg 8 also housed inmates who were in protective custody.  Plaintiff was not classified as a "keep away" inmate when transferred to the Seg 8 unit, nor was he considered a security risk who required housing in a single occupancy cell.  With respect to Seg 8, County policy dictated that, except for voluntary/involuntary status and selected disciplinary cases, the number of inmates to a cell shall not exceed two.  The policy provided that the only exception to this limit was "extreme conditions," and this exception had to be approved by the Chief of Corrections.  Seg 8 consisted of 32 cells.  On September 5, 2006, the night of the incident giving rise to this suit, Seg 8 housed 116 inmates.  Most or all of the 32 cells housed three inmates, with the remaining inmates housed in the "day room," a general pod in the middle of the living area. The MDC had a procedure and practice of having two corrections officers assigned to Seg 8 on any given shift.  However, at the time of the September 5, 2006 incident, Defendant Montoya was the only corrections officer on duty in Seg 8.

On September 5, 2006, Plaintiff shared a cell with two other inmates, Basillo Rojo and

Frank Fromenta. At that time, Mr. Fromenta had shared a cell with Plaintiff for two or three days. Plaintiff and Mr. Fromenta had played handball together several times over the two weeks prior to the incident, and had gotten along well. That evening, however, an argument over dessert escalated to the point that Mr. Fromenta punched Plaintiff hard enough to break his jaw.[1]

According to Plaintiff, the trouble between cellmates began just after they received their dinner trays in their cell. Plaintiff gave Mr. Fromenta his pudding in exchange for Mr. Fromenta's beans, but Mr. Fromenta got upset because he wanted Plaintiff's cake rather than his pudding. Mr. Fromenta slammed his tray on the table, splattering some of his food. Plaintiff responded by saying "You know what? If you're going to be acting like a little f***ing kid, just move, bro'....This is my f***ing cell. If you don't like it, take both trays and f***ing move, dude, because I don't want no bullshit." According to Plaintiff, both he and Mr. Fromenta were upset and glared at each other angrily, but never raised their voices substantially or yelled at each other. Mr. Fromenta apparently determined that the wisest thing to do was to ask Defendant Montoya, the corrections officer on duty in Seg 8 at the time, if one of them could be moved, because neither of them wanted to fight. Shortly thereafter, the cell door opened because it was time for juice to be passed out. Mr. Fromenta left the cell, went down the stairs to Defendant Montoya's observation platform, and told him that he and Plaintiff were having problems and that

---

[1] Plaintiff's description of the events leading up to his assault contains significant inconsistencies. For instance, he testified alternately that he could not hear a conversation between Mr. Fromenta and Defendant Montoya, that he could hear the conversation but not recall the exact words, and that he knew for a fact the exact words that comprised the conversation. *See* Deposition of Michael Candelaria, attached as Ex. A. to Doc. 38, at 70-71. His descriptions are also substantially at odds with the sworn testimony of Defendant Montoya. Nonetheless, at the summary jugment stage, the Court must accept Plaintiff's statement of facts and the reasonable inferences therefrom in the light most favorable to Plaintiff, and leave any credibility determinations to a jury. *See Plotke v. White*, 405 F.3d 1092, 1103 (10th Cir. 2005).

one of them needed to be moved because otherwise they were going to fight and he didn't want to fight.[2]

Defendant Montoya allegedly responded to this request by saying "No, Fromenta, no. Hell no. F*** no....Get your f***ing ass back up there in the cell now, Fromenta. You're not f***ing moving." He then chased Mr. Fromenta back up the stairs. As they neared the cell, Plaintiff stepped out and waved his hands and said "Montoya, please, let one of us move...I've been good all week. Please, Montoya, I don't want no problems." Montoya replied "No, no. I don't give a f***. Get your ass back in that cell." As Mr. Fromenta approached the open cell door, he told Defendant Montoya, who was right behind him, "I'm going to kick his f***ing ass if you put me in there. I can kick his f***ing ass." Defendant Montoya said "I don't give a f***. Get your f***ing ass back in that cell. You're not moving nowhere, Fromenta." At that point, having just entered the cell, Mr. Fromenta attempted to push the door open as Defendant Montoya was closing it. He pleaded "No, Montoya, please, me no problem, please, no problem." Defendant Montoya then kicked Mr. Fromenta in the leg, forcing him back into the cell, and slammed the cell door shut. Within seconds of being kicked back into the cell, Mr. Fromenta punched Plaintiff in the face, fracturing his jaw. After the punch, Plaintiff's other cellmate pulled Mr. Fromenta off of Plaintiff and held him. Defendant Montoya had not gotten more than five steps or so from the cell before Mr. Fromenta unleashed his punch. Upon hearing the punch,

---

[2] It is unclear from Plaintiff's deposition exactly what he alleges Mr. Fromenta told Defendant Montoya when he was down at the guard station, because much of the dialogue is paraphrased. However, at one point, Plaintiff testified that Mr. Fromenta told Defendant Montoya "We're having problems. I don't want problems. Let one of us move. Me and [Plaintiff] are going to get into it." Candelaria depo., attached as Ex. A to Doc. 38, at 68:21-23. At another point, he testified that Mr. Fromenta told Defendant Montoya "We're having problems. One of us needs to be moved....I don't want to be in there. We're going to fight." *Id.* at 71:17-19.

Defendant Montoya turned around immediately, unlocked the door, and handcuffed Mr. Fromenta. Plaintiff was also then handcuffed and taken to the medical ward. He then made a statement in the Captain's office about the incident.

At all times material to this case, Defendant Ronald C. Torres was the Director of the MDC, Defendant Henry Perea was the Deputy Director of the MDC, Defendant Aaron Alberti was a Captain at the MDC, and Defendant Robert Montoya was a corrections officer at the MDC. Plaintiff's complaint states six claims related to the incident. Counts I and II state claims under 42 U.S.C. § 1983 against Defendant Montoya in his personal capacity, alleging that he tacitly authorized or was knowingly indifferent to Plaintiff's battery. Count III states claims under 42 U.S.C. § 1983 against Defendants Torres, Perea, and Alberti, as well as Bernalillo County's Board of County Commissioners ("the County") for operating the MDC in a manner that placed inmates in segregation at a substantial risk of serious harm. Count IV states a tort claim against Defendant Montoya for negligently aiding and abetting Plaintiff's battery, and against Defendants Torres, Perea, and Alberti for negligent training and supervision. Count V states a claim for negligent operation of a public facility against all Defendants, and Count VI seeks to establish *respondeat superior* liability against the Bernalillo County Board of County Commissioners.

## LEGAL STANDARDS

A court should grant summary judgment "only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). The Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v.*

5

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant for summary judgment bears the initial burden of "showing the absence of a genuine issue of material fact."  *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995).  If the movant meets this initial burden, "[t]he burden then shifts to the nonmovant to produce evidence creating a genuine issue of material fact to be resolved at trial."  *Id*.  A genuine issue of material fact exists only if a reasonable jury could return a verdict for the nonmoving party in the face of all of the evidence presented.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Thus, although evidence is viewed and inferences drawn in a light most favorable to the nonmovant, "that party must still identify sufficient evidence which would require submission of the case to a jury."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1402 (10th Cir. 1997).  "In other words, the nonmoving party must 'make a showing sufficient to establish an inference of the existence of each element essential to the case.'"  *Id*. (citation omitted).

In a case such as this one, where a public employee is sued in his individual capacity, a defendant may raise the defense of qualified immunity.  *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).  The qualified immunity doctrine "shields public officials...from damage actions unless their conduct was unreasonable in light of clearly established law."  *Elder v. Holloway*, 510 U.S. 510, 512 (1994).  If a defendant has raised qualified immunity as a defense, the plaintiff must show both (1) that the defendant's actions violated a constitutional or statutory right, and (2) that the right alleged to have been violated was clearly established at the time of the alleged wrongful conduct.  *See Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006).  To be clearly established, a right's contours "must be 'sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right.'"  *Id*. (citation omitted).  However, "there need not be precise factual correspondence between earlier cases and the case at hand, because 'general

6

statements of the law are not inherently incapable of giving fair and clear warning....'" *Id.* at 913-14 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Thus, "a general constitutional rule that has already been established can 'apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Id.* (quoting *Hope*, 536 U.S. at 741).

## ANALYSIS

A. Section 1983 Claims against Defendant Montoya

42 U.S.C. § 1983 enables a plaintiff to sue individuals acting under color of law for alleged constitutional violations.  Plaintiff's Count I seeks relief against Defendant Montoya under the Fourth and Fourteenth Amendments for failure to protect him from being assaulted, while his Count II seeks relief for the same acts under the Eight Amendment.  At the time of his assault, Plaintiff was being held in the MDC as a pretrial detainee rather than as a convicted prisoner.  In the Tenth Circuit, "pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment."  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).  Thus, Plaintiff's Count II must be dismissed.

Even though Plaintiff's claim of unconstitutional conditions of confinement arises under the Due Process Clause rather than the Eighth Amendment, the standards of the Eighth Amendment still provide the benchmark for such claims, and the Court applies an identical analysis to this case as to Eighth Amendment cases brought pursuant to section 1983.  *See Olsen*, 312 F.3d at 1315; *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998).  The "deliberate indifference" of a prison official "to a substantial risk of serious harm violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  As part of their constitutional

obligations, "prison officials have a duty...to protect prisoners from violence at the hands of other prisoners." *Id*. at 833.  This is because "[h]aving incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id*. (citation omitted).  The protection that an inmate is afforded against other inmates is a "condition of confinement," subject to Eight Amendment strictures.  *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

To be sure, not every injury suffered by one prisoner at the hands of another creates constitutional liability for the officials responsible for the inmates' safety.  *See Farmer*, 511 U.S. at 834; *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).  Only a prison official "who knows of and disregards an excessive risk to inmate health or safety" can be said to be "deliberately indifferent" for Eighth Amendment purposes.  *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 837).  Therefore, in order to prevail on a constitutional claim for failure to protect, "a plaintiff 'must show that he is incarcerated under conditions posing a substantial risk of serious harm,' the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component."  *Benefield*, 241 F.3d at 1272 (quoting *Farmer*, 511 U.S. at 834).

Taking the objective component first, Plaintiff must demonstrate that he was "incarcerated under conditions posing a substantial risk of serious harm."  *Id*.  Although "[t]here exists no precise definition of those types of conditions of confinement that violate first prong of the *Farmer* test by 'posing a substantial risk of serious harm,'" it is clear that "prison officials have a constitutional duty to take reasonable measures to protect prisoners against current threats of attack and other 'sufficiently imminent dangers...likely to cause harm.'"  *See Grimsley v.*

8

*MacKay*, 93 F.3d 676, 681 (10th Cir. 1996) (citation omitted).  Plaintiff has produced evidence that Mr. Fromenta told Defendant Montoya at the guard station that he would fight with Plaintiff if returned to his cell and that, just prior to being forcibly kicked back into the cell, he threatened to "kick [Plaintiff's] f***ing ass" if he was placed back in the cell.  Plaintiff also produced evidence that he stepped out of the cell and pleaded with Defendant Montoya not to place the two of them together again.  Immediately after being forced back into the cell, Mr. Fromenta followed through on his threat, breaking Plaintiff's jaw.  If a jury were to believe Plaintiff's allegations, it could reasonably find that Defendant Montoya's failure to protect Plaintiff against a clearly-voiced current threat constituted exposure to a "substantial risk of serious harm."

Turning next to the subjective component, in order to violate the Eighth Amendment, an "official [must] actually be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 837).  In this manner, "deliberate indifference entails something more than mere negligence...[but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result."  *Verdecia v. Adams*, 327 F.3d 1171 (10th Cir. 2003) (quoting *Farmer*, 511 U.S. at 835).  Under this standard, it is not enough to allege that a prison official failed "to alleviate a significant risk that he should have perceived but did not."  *Farmer* at 838.  Rather, in order to demonstrate "the requisite deliberate indifference, a plaintiff must establish that [the] defendant[] knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'"  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847).  This necessarily requires an "inquiry into a prison official's state of mind," *Farmer* at 838, which is properly the province of the jury.

9

Although the question of deliberate indifference is a subjective inquiry, "a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya*, 516 F.3d at 916. In response to this evidence, "the defendant may present evidence to show that he was in fact unaware of the risk, in spite of the obviousness." *Id*. at 917. Just as a defendant may present evidence "that [he] did not know of the underlying facts indicating a sufficiently substantial danger and that [he] was therefore unaware of a danger, or that [he] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," he may also "be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 at 844.

The arguments advanced by Defendant regarding the circumstances surrounding the assault go more toward establishing whether he was aware of the danger to Plaintiff and whether he acted reasonably under the circumstances than to whether, if Plaintiff's contentions are believed, Plaintiff's constitutional rights could have been violated. Defendant Montoya points out that Mr. Fromenta and Plaintiff had no history of violence between them and had gotten along well in the days leading up to the assault, that their voices were never raised during their argument, and that Plaintiff acknowledges that neither he nor Mr. Fromenta wanted to fight. He also argues that Plaintiff did not express fear of Mr. Fromenta and that he admittedly did not expect to be hit by Mr. Fromenta when Mr. Fromenta was forced back into the cell. Defendant Montoya also contends that during each shift he is approached multiple times by inmates asking to be moved, and that he does not have the ability to honor all of their wishes nor reason to know which of their threats they will ultimately follow through on. These arguments are more properly for the consideration by a jury at trial than by the Court on a summary judgment motion. The

10

Court is keenly aware of "prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" *Farmer*, 511 U.S. at 845-46 (citation omitted), and that making a mistaken judgment call in the heat of a busy shift does not rise to the level of a constitutional violation.  Nonetheless, because Plaintiff has set forth sufficient evidence such that a reasonable jury could find that Defendant Montoya knew that Mr. Fromenta's threat indicated a sufficiently substantial danger to Plaintiff, and that he was deliberately indifferent to this threat, for the Court to find that Defendant Montoya's actions were reasonable under the circumstances would be to improperly substitute its judgment for that of the jury.

In order to survive summary judgment when a defendant has raised the affirmative defense of qualified immunity, the plaintiff must not only demonstrate that the facts as alleged support a claim that a constitutional right was violated (as Plaintiff has done), but he must also demonstrate that the right alleged to have been violated was clearly established at the time of the alleged wrongful conduct.  *See Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006).  To demonstrate that the right was clearly established, a plaintiff need not show that the action at issue had specifically been held unlawful previously, but rather only that the unlawfulness of the defendant's conduct should have been apparent in light of existing law.  *See Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, 1260 (10th Cir. 1998).  Defendant Montoya argues that the law regarding his alleged deprivation of Plaintiff's right to be free from a substantial risk of serious harm was not well established at the time of the incident because the law does not require an officer to forestall an attack where the attack cannot be anticipated.  *See* Defendants' Motion for Summary Judgment ("Deft. Mot.") [Doc. 38] at 14; Defendants' Reply ("Deft. Rep.") [Doc. 53 at 8-9.

Certainly, in one respect, Defendant's statement of the law is correct: liability cannot be

11

imposed if an officer could not anticipate the danger that ultimately comes to pass. However, the law subjecting a prison official to liability for being deliberately indifferent to conditions posing a substantial risk of serious harm to an inmate has been well established at least since the *Farmer* decision in 1994. For a right to be clearly established, its contours must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). A reasonable official who deliberately ignores a substantial risk of serious harm could not credibly claim that it was not apparent that he could deliberately ignore such a risk with legal impunity. Thus, in a case alleging deliberate indifference in which sufficient evidence exists to enable a reasonable jury to make a finding in a plaintiff's favor on the objective component, summary judgment on the basis of qualified immunity must be precluded almost by definition.

The cases that Defendant Montoya cites for his contention that other courts have found no duty to act in a situation such as raised by this case are inapposite. For instance, in *Szymanski v. Benton*, 289 Fed. Appx. 315 (10th Cir., August 14, 2008), while the court found insufficient evidence to support a failure to protect claim, it did so in a situation where the plaintiff made no claim that the guards had been made aware of a threat of physical violence against him. *See* Deft. Mot. [Doc. 38] at 14-15. Similarly, although the court in *Brown v. Dorneker*, 2008 WL 3334025 (D. Kan., August 8, 2009) found that the failure to move to another cell a plaintiff who was later assaulted did not state a claim of deliberate indifference, this case is of no help to Defendant Montoya because the attacker in that case made only vague, general threats and he "never specified whether he was threatening inmates or prison guards, and he never threatened a specific individual." *Brown*, 2008 WL 3334025 at *5. Finally, in *Berry v. Sherman*, 365 F.3d 631 (8th Cir. 2004), the court's grant of qualified immunity was based on a finding that "[n]othing in the

record shows the officials knew or had notice that [the assailant] planned to attack [the plaintiff.]" *Berry*, 365 F. 3d at 634.   In this case, Plaintiff has offered sufficient evidence that Defendant Montoya had notice of the planned attack and ignored that notice, resulting in Plaintiff's fractured jaw.  Whether Defendant Montoya was justified in ignoring Mr. Fromenta's threat is a question for the jury, but this case involves a specific threat made in the guard's presence, and therefore presents a different case than those in which the plaintiffs offered no evidence to demonstrate that the guards had notice of potential harm.  Thus, Defendant Montoya's claim to qualified immunity is denied, and Plaintiff's claim against him in Count I survives.

B.  Section 1983 Claims against Defendant Bernalillo County

In order to establish municipal liability under section 1983, a plaintiff must show that a state actor committed a constitutional violation pursuant to an official custom, policy, or practice of the governmental entity.  *See Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  In order to amount to a constitutional violation, the policy or practice of the government must evidence a "deliberate indifference" toward the rights of an individual or class, and the policy must be the 'moving force [behind] the constitutional violation.'"  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (citation omitted).  The "deliberate indifference" standard may be met by showing that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  In order to establish that the County is liable for a constitutional violation, Plaintiff must come forward with sufficient evidence to demonstrate that: (1) the risk of harm to inmates in segregation "was so substantial or pervasive" that the County's knowledge of a specific risk to Plaintiff can be inferred; (2) the County failed to take reasonable measures to avert the harm; and

13

(3) the County's "failure to take such measures in light of its knowledge, actual or inferred, justifies liability for the attendant consequences of its conduct, even though unintended." *Berry v. Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990).

Plaintiff contends that the County operated the MDC in a way that placed inmates in segregation units at a pervasive risk of inmate-on-inmate violence and that the County deliberately neglected to enforce procedures and regulations designed to protect inmates from violence because they placed inmates in segregation units in contact with each other and placed more than one inmate in each cell. Further, Plaintiff contends that the County is liable for failing to adequately train and supervise MDC employees, including Defendant Montoya.

Plaintiff's constitutional claims against the County must be dismissed, however, because he has failed to demonstrate a direct causal link between the County's actions and the infliction of injury by a fellow inmate. *See Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003). Plaintiff alleges that the MDC in general, and its segregation units in particular, were overcrowded at the time of his assault, and provides testimonial evidence that overcrowding can create a higher risk of harm to inmates. However, overcrowding, by itself, does not rise to the level of a constitutional violation. *See Rhodes v. Chapman*, 452 U.S. 337, 348-49 (1981). Instead, to prevail on his constitutional claim, Plaintiff must demonstrate a "direct causal link" between the allegedly unconstitutional conditions of his incarceration and his injury. Although he characterizes the unit in which he was incarcerated as an "overcrowded and understaffed tinderbox of tension and violence," Plaintiff's Response to Defendants' Motion for Summary Judgment ("Pl. Resp.") [Doc. 47] at 21, he has not provided evidence that his injury was the result of an overcrowded or understaffed condition, or even that the risk to inmates in the segregation unit was so substantial or pervasive that the County's knowledge of a risk to Plaintiff can be

14

inferred.

It is undisputed that, when initially booking Plaintiff, jail officials interviewed him to determine whether he had any known enemies or gang affiliations in order to avoid placing him in a high-risk housing situation.  When he developed problems in his previous housing unit and notified prison officials of perceived threats, they moved him to Seg 8 so that he could be re-classified and placed in a new unit.  In addition, Plaintiff was not classified as a maximum security inmate, which would have required that he be placed in a single cell and isolated from other segregated inmates.  Plaintiff admits that, prior to the incident, he got along well with his cell mates, and he provides no evidence that he feared violence while being housed in Seg 8.  Thus, he has shown no nexus between the allegedly unsafe conditions and his injury.

In fact, Plaintiff contends that his injury was caused by the alleged unconstitutional failure of Defendant Montoya to protect him from Mr. Fromenta when Defendant Montoya was in a position to offer him such protection.  By Plaintiff's own admission, Defendant Montoya was in a position to prevent his assault, and it was only Defendant Montoya's refusal to intervene and his forcing of Mr. Fromenta back into Plaintiff's cell that enabled the assault to occur.  Under Plaintiff's own theory, the system that the County put in place to protect inmates would have worked to prevent Plaintiff's assault but for the allegedly unconstitutional failure to act by Mr. Montoya.  The County cannot be held liable if Mr. Montoya acted with deliberate indifference in the face of a known substantial risk of serious harm, because "[u]nder § 1983, government officials are not vicariously liable for the misconduct of their subordinates."  *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006).  Plaintiff has failed to offer evidence showing that the County was "deliberately indifferent" to any conditions that actually caused his injury, and therefore the County cannot be held liable on this basis.

Plaintiff also asserts that the County is liable for failing to adequately train or supervise MDC employees, including Defendant Montoya. In order to state a section 1983 claim for liability due to inadequate training, Plaintiff must identify a specific deficiency in Defendant's training program that is closely related to his injury and must be able to prove that the deficiency in training actually caused jail personnel to act with deliberate indifference. *See Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). The *LeMaster* court held that evidence that jailers received no formal training at all and that the jail had recently been cited twice by state inspectors for deficiencies in training was insufficient to survive summary judgment in a claim brought by an inmate who was beaten by other inmates after alerting jailers to threats against him, because he could not show that a failure of jailers to receive specific training resulted in his injuries. *Id*. A plaintiff may demonstrate inadequate training by showing "essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988). Plaintiff's claim falls far short of making this showing.

Plaintiff's inadequate training contention appears to be based on testimony by Defendant Henry Perea, who served as the MDC's Deputy Chief of Security and was in charge of officer training at the time of Plaintiff's assault. At his deposition, Defendant Perea testified that he was unaware of any specific MDC policy mandating that correctional officers respond in a particular manner when they hear an inmate threaten another inmate, and that he could not identify the specific training that officers received regarding how to judge whether to intervene in the face of an inmate's threat to hurt another inmate. Perea depo., attached as Ex. 15 to Pl. Resp. [Doc. 47] at 30:9-13; 38:6-40:4. Although Plaintiff has identified an area of training that is arguably related to his injury, he has failed to come forward with evidence that the County had actual or

16

constructive notice that its training program, in particular its program relating to recognizing the

potential for inmate-on-inmate violence, was "substantially certain to result in a constitutional

violation, and [that] it consciously or deliberately [chose] to disregard the risk of harm." *Barney*,

143 F.3d at 1307.  Indeed, the County has come forward with undisputed evidence establishing

that Defendant Montoya received extensive training at the Cadet Academy in 2001, with follow-

up in-service training in 2003 and 2005 and annual refresher courses on interpersonal skills.  *See*

Affidavit of Kristina Bainbridge, attached as Ex. D to Deft. Mot. at ¶¶ 8-11.  The training on

interpersonal skills is designed to teach officers how to listen and observe, how to understand

their surroundings, and how to make judgment calls based on those observations.  *See* Deposition

of Ronald Torres**,** attached as Ex. 9 to Pl. Resp. [Doc. 47] at 57:12-60:11.  Thus, given the

undisputed evidence of the training that the County  provided to Defendant Montoya, the record

is wholly insufficient to establish liability against the County for failure to train.

     C.  <u>Section 1983 Claims Against Individual Supervisory Defendants</u>

     Plaintiff has stated his section 1983 claims related to overcrowding, inadequate staffing,

and insufficient training against Defendants Torres, Perea, and Alberti in their individual

capacities, in addition to stating the same claims against the County.  However, he does not allege

that any of these individuals were present during the assault by Mr. Fromenta or that any of them

personally participated in any of the circumstances surrounding the assault.  Personal

participation is essential to support liability in a section 1983 claim.  *See Mitchell v. Maynard*, 80

F.3d 1433, 1441 (10th Cir. 1996).  Therefore, in order to state a claim against these individual

defendants, Plaintiff must rely on these defendants' roles in having personally managed policies

and practices that resulted in the alleged constitutional violations.  *See Grimsley v. MacKay*, 93

F.3d 676, 680 (10th Cir. 1996).  Because, as discussed in detail above, Plaintiff has not presented

evidence that any of the MDC's policies or practices resulted in constitutional violations, he cannot establish liability on the part of the individual defendants for establishing or managing those policies or practices.

Plaintiff has raised one additional policy, not addressed above, of an individual defendant that allegedly led to a constitutional violation. This allegation relates to Defendant Alberti's alleged disregard of his duty to conduct substantive investigations into incidents of potential misconduct by subordinates. Plaintiff's contention is based on Defendant Alberti's "pencil whipping" of internal investigative reports, wherein he would sign reports drafted by administrative aides and pass them up the chain of command without actually reviewing their contents. *See* Deposition of Aaron Alberti, attached as Ex. 12 to Pl. Resp. [Doc. 47] at 41. In order to prevail on a section 1983 claim for supervisory liability, a plaintiff must demonstrate that a supervisor intentionally, consciously, and deliberately participated in, or knowingly acquiesced in, the underlying unconstitutional behavior by the subordinate. *See Woodward v. Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992). It is not enough to show that a supervisor "should have known" that a subordinate was violating someone's constitutional rights; only inaction in the face of demonstrated actual knowledge of constitutional violations will establish the requisite "deliberate indifference" necessary to establish supervisory liability. *Id.*; *Meade*, 841 F.2d at 1528. While Defendant Alberti's practice of passing internal investigative reports up the chain of command without sufficient review may not be cause for commendation, it does not constitute knowing acquiescence in a constitutional violation. Plaintiff has not offered any evidence that Defendant Montoya or any other officer under Defendant Alberti's supervision had engaged in constitutional violations prior to the night of his assault, so, by definition, he has failed to offer any evidence that Defendant Alberti was aware of any constitutional violations perpetrated by his

18

subordinates about which he deliberately failed to take action.

Plaintiff's implication that he would not have been injured if Defendant Alberti had reviewed incident reports more thoroughly before signing them and passing them up the chain of command is nothing more than conjecture, and is insufficient to demonstrate a constitutional violation.[3]  He offers no evidence that investigations were not conducted, or that the facts in the investigative reports would have been different, that their quality would have been improved, or that the officials higher up the chain of command would have acted on the reports in a different manner had they been more closely reviewed by Defendant Alberti.  All section 1983 claims against Defendants Torres, Perea, and Alberti are dismissed.

D.  State Law Battery Claim

In Count IV, Plaintiff brings a claim against all Defendants for battery.[4]  New Mexico case law enables a plaintiff to bring a tort action for the negligence of a law enforcement official when that negligence results in a tort enumerated in NMSA § 41-4-12, one of which is battery. *See Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 121 N.M. 646, 653 (1996). Defendant Montoya did not move for summary judgment on Plaintiff's battery claim.  *See* Def't Mot. [Doc. 38] at 20 n.2.  As the battery claim remains against Defendant Montoya, it remains against the County as well under the doctrine of *respondeat superior*.  *See Silva v. State*, 106

---

[3] As a factual matter, Plaintiff's assertion regarding deficiencies in Defendant Alberti's report reviewing procedure is further weakened by the fact that Plaintiff signed a form indicating that he wanted all charges against Mr. Fromenta dropped and any investigation into the incident terminated, as well as a form concurring with Defendant Montoya's report of events.  *See* Ex. 7 attached to Defendant Aaron Alberti's Motion for Summary Judgment [Doc. 39].

[4] Count IV also initially stated claims for false imprisonment and intentional infliction of emotional express, but Plaintiff has dropped those claims.  *See* Pl. Resp. at 18.

N.M. 472, 477 (1987).[5]

With regard to the torts enumerated in NMSA § 41-4-12, "allegations of negligence are appropriate only to the extent that a law enforcement officer's negligence is alleged to have caused a third party to commit one of the specified intentional torts," in this case, battery. *Lessen v. City of Albuquerque*, 144 N.M. 314, 322 (Ct. App. 2008). With respect to Defendants Torres, Perea, and Alberti, Plaintiff has failed to come forward with evidence that would enable a reasonable jury to find that negligence on any of their parts caused Mr. Fromenta to commit battery on Plaintiff. Plaintiff has not presented evidence that his conditions of confinement, including the alleged overcrowding, were the proximate cause of his assault, nor has he demonstrated that Mr. Alberti's alleged shortcomings in reviewing his internal incident reports caused Mr. Fromenta to beat him. Finally, Plaintiff has not offered evidence that negligence by supervisors in hiring or training Defendant Montoya caused his injury. Thus, Defendants Torres, Perea, and Alberti are entitled to summary judgment on this claim.

E.  Negligent Operation of a Public Facility

In Count V, Plaintiff makes a claim against all Defendants for negligent operation of a public facility. NMSA § 41-4-6 waives sovereign immunity for the negligent operation or maintenance of a public facility. In contrast to Plaintiff's battery claim that was brought pursuant to NMSA § 41-4-12, in order to maintain a claim of negligent operation of a public facility under § 41-4-6, Plaintiff must demonstrate that Defendants' alleged negligence resulted not simply in an unacceptably high risk of danger to him personally, but rather resulted in such a risk to the prison

---

[5] Plaintiff's Claim VI asserts a claim of *respondeat superior* liability against the County. As the County is liable for the torts of its employees as a matter of state law, this claim does not assert an independent ground for relief and is merely duplicative.

population at large. *See Archibeque v. Moya*, 116 N.M. 616, 619-20 (1993) (immunity not

waived under § 41-4-6 when plaintiff assaulted due to his negligent placement in general

population, because negligence only created a danger for him rather than the prison population as

a whole). *See also Oliveros v. Mitchell*, 449 F.3d 1091, 1096-97 (10th Cir. 2006) (citing

*Archibeque* for the proposition that negligence must cause risk to population at large for waiver of

immunity to be valid under § 41-4-6).

Section 41-4-6 does not waive immunity solely in cases in which injury results from a

physical defect of the premises. *See Bober v. New Mexico State Fair*, 111 N.M. 644, 652-53

(1991). Instead, "[s]ection 41-4-6...contemplates waiver of immunity where due to the alleged

negligence of public employees an injury arises from an unsafe, dangerous, or defective condition

on property owned and operated by the government." *Id.* at 653 (quoting *Castillo v. County of

Santa Fe*, 107 N.M. 204, 205 (1988)). This includes cases in which a segment of a prison

population is put at risk due to negligent practices. *See Callaway v. New Mexico Dep't of Corr.*,

117 N.M. 637, 643 (Ct. App. 1994) (holding that immunity had been waived where plaintiff

alleged that prison officials were negligent in allowing known and dangerous gang members

loose in the general population when they had access to potential weapons in the recreation area,

because the danger to other inmates was foreseeable). *See also Archibeque*, 116 N.M. at 621 n.3

("a segment of the population at risk [from a prison's disregard of the standards required by a

consent decree] might justify waiver of immunity under section 41-4-6"). The *Callaway* court

stressed the difference "between a 'discrete administrative decision' which does not waive

immunity and 'a general condition of unreasonable risk from negligent security practices' which

could waive immunity." *Callaway*, 117 N.M. at 643 (quoting the special concurrence of Chief

Justice Ransom in *Archibeque*, 116 N.M. at 622). It held that the plaintiff stated a claim

sufficient to waive immunity under § 41-4-6 because the "[d]efendants knew or should have known that [the roving gang members] created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." *Id.*

Viewing the evidence in the light most favorable to Plaintiff, he has come forward with sufficient evidence to raise a question of fact regarding whether officials of the MDC were negligent in permitting the overcrowding and understaffing of the Seg 8 unit at the time of Plaintiff's assult, and whether such negligence put the overall population of the Seg 8 unit at risk.[6] The MDC committed to follow the American Correctional Association ("ACA") Guidelines for Adult Local Detention Facilities in a June 30, 2005 settlement agreement in the case of *McClendon v. City of Albuquerque*, CIV-95-24 MV/ACT.  *See* Stipulated Settlement Agreement, attached as Ex. 20 to Pl. Resp. at 5-6.  Under the ACA guidelines, cells in segregation units should be single occupancy.  *See* Guidelines, attached as Ex. 21 to Pl. Resp.  The Seg 8 unit is comprised of 32 cells, so that if the MDC had been following ACA guidelines as it committed to do through the settlement agreement, the unit's maximum capacity would be 32 inmates.  *See* Alberti depo. at 21:5-10.  Rather than following the ACA guidelines, the MDC had a policy of allowing two inmates per cell in its segregation units.  *See* MDC Policy 901(A)(3), attached as Ex. 22 to Pl. Resp.  This resulted in a planned capacity of 64 inmates per unit in Seg 8.  *See* Alberti depo., attached as Ex. 12 to Pl. Resp., at 21:7-9 ("your max population for those cell designs is a two-man cell.  So 64 should be your population on the unit"); Torres depo., attached

---

[6] Although Plaintiff presents evidence concerning overcrowding at the MDC in general in addition to overcrowding in the Seg 8 unit in particular, the Court focuses only on the contentions related to Seg 8 because it is those contentions that are relevant to Plaintiff's claim. In other words, if Plaintiff had contended that his unit was not overcrowded, but the rest of the MDC was, he would be hard-pressed to show an injury to himself based on overcrowding elsewhere.

as Ex. 9 to Pl. Resp., at 40:1 ("The designed capacity is 64").

Plaintiff presents testimony from prison officials that the purpose behind the MDC's policy of limiting segregation units to two inmates per cell was to "keep tensions down" and to "make it more livable," because anything over two inmates per cell in a segregation unit "is just too much," Perea depo., attached as Ex. 15 to Pl. Resp., at 23. He also presents testimony that overcrowding can increase tension among inmates and lead to a greater risk of altercations. *See* Alberti depo. at 22:5-16. *See also* First Report of the Operations Auditor in the *McClendon* case, dated September 29, 2005, attached as Ex. 8 to Pl. Resp. at 10 ("In terms of inmate safety, [the MDC] has several problematic issues, which...are largely resulting from the ills of overcrowding. Due to the lack of adequate cell space, jail officials are housing three inmates to cells that were designed for only two inmates."). At the time of Plaintiff's assault, Seg 8 housed 116 inmates–three inmates per cell, with 20 additional inmates on the floor of the dayroom. This population represented 363% of the unit's capacity under the ACA guidelines and 181% of its capacity under the MDC's own policy of housing two inmates per cell in segregation units. Plaintiff has presented sufficient evidence to create a question of fact as to whether this constituted a "general condition of unreasonable risk" to the residents of Seg 8. *Callaway*, 117 N.M. at 463.

Plaintiff has also succeeded in raising a question of fact concerning whether understaffing with respect to corrections officers created unsafe conditions for the residents of Seg 8. At the time of Plaintiff's assault, the MDC had a policy or procedure of keeping two corrections officers on duty in the Seg 8 unit at all times. *See* Perea depo. at 24-25; Alberti depo. at 26:21-24. According to Defendant Perea, this procedure was in place for security and safety purposes because, especially given the large number of inmates in Seg 8, "tensions could rise" and "things

could flare up," including fights, so that having two officers helps to ensure the well-being of the inmates.  Perea depo. at 25-26.  Despite this policy or procedure, and the inmate-safety reasons behind it, Defendant Montoya appears to have been the only corrections officer on duty in Seg 8 the night Plaintiff was assaulted, with responsibility to monitor all 116 inmates in the unit. Whether Defendant Board of County Commissioners of Bernalillo County was negligent in understaffing the unit and whether this created an unreasonable risk for the inmates housed in Seg 8 is a question for the jury.  Plaintiff has not come forward with evidence that any of the individual Defendants had the ability to control overcrowding or staffing.  Therefore, to the extent he has stated a claim under § 41-4-6, it is only against the County and not against any individual Defendant.

Also in support of his negligent operation of a public facility claim, Plaintiff has come forward with evidence that the process of conducting internal investigations is important to inmate safety, and that Defendant Alberti's repeated failure to review the investigative reports given to him by administrative aides could have led to a less safe environment.  Nonetheless, reviewing reports is an administrative function, and section 41-4-6 does not waive immunity when public employees negligently perform administrative functions.  *See Archibeque*, 116 N.M. at 619.  Therefore, neither Defendant Alberti nor the County can be held liable for Defendant Alberti's alleged negligence in reviewing reports of internal investigations.

## <u>CONCLUSION</u>

**IT IS THEREFORE ORDERED** that Defendants Robert Montoya, Ronald C. Torres, Henry Perea, and the Board of County Commissioners of Bernalillo County's *Motion for Summary Judgment* [Doc. 38] is GRANTED in part and DENIED in part.  Defendant Aaron Alberti's *Motion for Summary Judgment* [Doc. 39] is GRANTED.  Plaintiff's Count I and Count

IV survive against Defendant Montoya in his individual capacity, and his Count V survives against Defendant Board of County Commissioners of Bernalillo County.


**UNITED STATES DISTRICT JUDGE**